UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Altronic, LLC, | ) | CASE NO.: 4:12CV2981 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER AND DECISION** |
| | ) | |
| Jason Green, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the Court on Motion for a Temporary Restraining Order filed by Plaintiff Altronic, LLC. The Court has been advised, has reviewed the parties' motions and supporting documents, and has reviewed the applicable law. Moreover, the Court conducted a hearing, received testimony, and reviewed exhibits on December 7, 2012. For the reasons that follow, the motion is DENIED.

**I.    Facts**

On June 30, 2002, Altronic entered an asset purchase agreement with Gas Technologies, Inc. ("GTI") and numerous individuals, including Jason Green. The primary assets at issue were two patents, the '260 patent and the '395 patent. These patents involved a "bi-fuel control system and assembly for reciprocal diesel engine powered electric generators." Essentially, they detailed a system that would allow a diesel powered engine to be converted over to bi-fuel and utilize natural gas in addition to diesel fuel. On May 20, 2005, the parties entered into an amendment to the asset purchase agreement. Under the agreement, GTI would be reformed as an entity known as Gaseous Fuel Systems Corp. ("GFS"). Within that agreement, Altronic also entered into an exclusive patent agreement with GFS, licensing the '260 and '395 patents in exchange for roughly $1.85 million.

In addition to the agreements described above, Defendant Jason Green also entered into two employment agreements with Altronic. First, Green worked as an employee. Later, Green signed a consulting agreement with Altronic. Green terminated that agreement on December 31, 2011. The underlying complaint in this matter was filed on November 19, 2012 in state court and stems from the licensing agreement and the consultant agreement. Defendants removed the matter on December 4, 2012, and this Court conducted a TRO hearing on December 7, 2012. The Court now resolves the motion for a TRO.

**II.    Law and Analysis**

When determining whether to issue a temporary restraining order or a preliminary injunction, this Court considers the following four factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (quoting *Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)). This Court must balance the four factors while noting that none should be considered a prerequisite to the grant of injunctive relief. See *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). Moreover, a plaintiff must present clear and convincing evidence in support of the four factors. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-68 (Ohio Ct. App. 2000).

**A.    GFS**

First, Altronic seeks to enjoin GFS from attending a trade show that begins on December 11, 2012. In support, Altronic claims that GFS is in breach of the patent licensing agreement. The agreement allows for GFS to utilize the two patents described above in a particular "field of use," –

the mobile field. At the same time, Altronic reserved all rights to use the patents in the stationary field of use. The agreement also provides as follows:

> If either or both LICENSEE or LICENSOR make Improvements, patented or unpatented, the Parties agree that each will have an exclusive right to make, have made, use, sell, or offer for sale the Improvements as follows: LICENSEE in the Field of Use and LICENSOR outside the Field of Use.

Doc. 7-6 at. 3. Moreover, the agreement defined "improvements" as follows:

> 'Improvement' means any knowledge, information, design, data, drawings, know-how, concepts, observations, techniques, products, methods, software, design changes and the like that modifies, improves, adds or changes a component, material and/or process useful in or related to the Patents.

Doc. 7-6 at 2.

There is no disagreement that GFS has placed a product on its website that is outside the field of use, the EVO-SP system. However, the parties strongly disagree over whether the EVO-SP system falls with the realm of the licensing agreement. In that regard, the Court reviews the four factors described above in its TRO analysis.

1. Likelihood of Success on the Merits

Upon review, the Court finds that Altronic has not presented clear and convincing evidence of a strong likelihood of success on the merits.

In support of its claim, Altronic offered testimony that the EVO-SP is offered on GFS' website and provides much of the same functionality of the bi-fuel system described in the patents. Altronic, however, sought to equate the functionality of the system with its components. In other words, Altronic asks the Court to conclude that since the patented system and the EVO-SP offer similar features, the EVO-SP **must** therefore be an improvement under the licensing agreement. In that respect, the Court acknowledges that the parties have broadly defined "improvement" to essentially include any conceivable system that is related to the patents in any manner. Further, it is possible that further discovery in this matter may ultimately lead to that conclusion. However, the

evidence before the Court currently does not show by the clear and convincing standard that the EVO-SP is an improvement.

Instead, Jason Green's testimony indicated that he attempted to improve upon the patents in order to make them more functional with today's highly electronic diesel engines. Green swore in his declaration that his company, GFS, expended nearly $2 million in an effort to improve the patents. According to Green, these efforts were an unmitigated failure. Green then asserts that he started from a clear slate and developed the EVO-SP system. Green swore during his testimony that this system was effectively "the opposite" of what was patented. Green also opined that he was aware that it was the opposite because he was the named inventor of both the patents at issue.

In response, Altronic sought to demonstrate that the EVO-SP system fell under the broad definition of improvement. To do so, Altronic cross-examined Green on the issue. The Court acknowledges that Green was evasive, at best, when answering this line of questioning. However, the questions themselves were also inartful. For example, Green was asked whether the EVO-SP system was a technique, or a product, or a method, or any of the other terms utilized in the definition of "improvement" in the licensing agreement. However, even an affirmative answer to any of these questions would not tie the EVO-SP system to the underlying patents. That is – even a method or technique or product must be "useful in or related to" the patents in order to be an improvement. The record simply lacks the evidence to draw a comparison between the EVO-SP's components and the components detailed in the patents.1

Again, the Court recognizes that any shortcoming in this evidence is likely the result of the fact that Altronic learned of the existence of the EVO-SP prior to it being commercially sold. Accordingly, while there is a two-dimensional picture of the product on a website, no one from

---

1 The Court would also note that Altronic's own witnesses declined to opine on the meaning of certain terms in the patents, making it all the more difficult for the Court to conclude that the EVO-SP is an improvement on those undefined terms.

Altronic has ever been able to fully view the EVO-SP to opine on its components and analyze their similarity or dissimilarity to the patents at issue. However, without such a comparison, Altronic cannot meet its high burden of showing by clear and convincing evidence that it has a strong likelihood of success on the merits.

2. Irreparable Injury

The Court also finds that Altronic has fallen short of demonstrating irreparable injury. It is unclear what would be irreparable with respect to the injuries herein. The parties have entered into a licensing agreement. Under that agreement, GFS is free to utilize any improvements to the patents within its field of use. As such, it cannot be a loss of goodwill from the perception that GFS is somehow more innovative than Altronic – such a conclusion could be reached by the general public if GFS simply utilized the improvements within the field of use. Any lost sales resulting from the EVO-SP system being placed on the market would be readily compensable through monetary damages. Accordingly, this prong weighs against issuing the injunction.

3. Harm to Others

The Court finds that this prong neither weighs heavily against or heavily in favor of issuing the TRO. There is no question that GFS would suffer a substantial monetary harm if the injunction were to issue, having invested a substantial amount of money in preparation of the tradeshow. However, if GFS were in breach of the agreement, its harm would be legally irrelevant. There was testimony from Jason Green that several of its current customers from the mobile field were planning on attending the tradeshow to see the EVO-SP system and to determine whether they would expand their agreement with GFS. Thus, these companies could conceivably be harmed if GFS is enjoined at this late date. At the same time, the record amply demonstrates that this is the largest tradeshow in the world for the stationary bi-fuel market, so it is unlikely that these third parties would be harmed in any meaningful way if one vendor were not to appear. As such, this prong neither weighs in favor or

against issuing the TRO.

   4. Public Interest

There is a strong public interest in having access to the newest technology on the market in the bi-fuel industry. The parties clearly recognized this fact by allowing each other to utilize improvements to the patent in their respective fields of use. As any resulting sales will lead to calculatable monetary damages, the public interest supports allowing the exhibition of the new technology of the trade show.

Based upon the above, the Court declines to enjoin GFS from attending the trade show. With respect to GFS, the motion for a temporary restraining order is DENIED.

   **B. Jason Green**

Altronic also seeks to enjoin Jason Green's employment with GFS. In support, Altronic relies upon a non-compete provision in Green's consulting contract that provides:

> Consultant covenants and agrees that he will not for a period of five (5) years from the actual date that Consultant's work for Company ceases, for whatever reason take any action to foster competition with the business of Company including but not limited to the GTI Business and, in particular, will not:
>
> (i) directly or indirectly own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or be connected as a partner, consultant or otherwise with any business or entity involved in the manufacture, sale or distribution of controls for reciprocating engines or bi-fuel conversion systems for reciprocating engines, except for those cases where such engines are installed solely in, and provide power for the mobility of, vehicles; or
>
> (ii) intentionally induce or assist others to induce or attempt to induce, in any manner, directly or indirectly, any distributor, agent, consultant, representative, customer, client, or any other person or concern dealing with or in any way associated with Company to terminate or to modify in any other fashion to the detriment of Company, such association with Company.

Doc. 1-1 at 12. Effectively, by the terms above, Green could maintain his position with GFS so long as GFS stayed in the mobile market and out of the stationary market.

However, there are numerous factors that this Court must consider in evaluating the non-compete provision.

> A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. The factors to consider when deciding whether a noncompete clause is reasonable include: 1) the absence or presence of limitations as to time and space, 2) whether the employee represents the sole contact with the customer, 3) whether the employee is possessed with confidential information or trade secrets, 4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition, 5) whether the covenant seeks to stifle the inherent skill and experience of the employee, 6) whether the benefit to the employer is disproportional to the detriment to the employee, 7) whether the covenant operates as a bar to the employee's sole means of support, 8) whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment, and 9) whether the forbidden employment is merely incidental to the main employment.

*Alan v. Andrews*, 2007 WL 1544717, at *8 (Ohio Ct. App. May 22, 2007) (citation and quotation omitted).

A review of the above factors weighs strongly against enforcing the non-compete provision *at this early stage* of the litigation. Initially, there is no geographic limitation to the covenant. Second, the five-year span is certainly on the outer limits if not beyond those limits of reasonable. This fact, however, can be remedied by the Court ultimately reducing that period of time. As Green's consulting agreement was terminated less than one year ago, enforcing the non-compete as of today would not be unreasonable. The remaining factors, however, weigh against enforcement.

The record before this Court demonstrates that Green is not in possession of confidential information or trade secrets. Instead, the record reflects that any information that Green possesses is already known to GFS through two different mechanisms. First, GFS was a distributor for Altronic, thereby gaining access to customer and price lists. Further, GFS employs two employees that previously worked for Altronic. Testimony before this Court demonstrates that these employees did not have confidentiality agreements and had the same knowledge of Altronic's operations that Green

has. Accordingly, there is nothing in the record to suggest that Green has confidential information that would be unknown to GFS but for his ongoing employment.

The covenant also seeks to eliminate all competition, not simply unfair competition. For that matter, the covenant prohibits not only competition, but any attempts to even "foster" competition. There is also little doubt that the covenant seeks to stifle the inherent skill of Jason Green. Throughout his consulting agreement, Green maintained employment with GFS. During that time frame, Green was actively attempting to create and innovate in the bi-fuel conversion field. In fact, Green contends that the EVO-SP system at issue herein is really just a carryover from his work on the EVO-MT system in the mobile field. Thus, it is clear that covenant seeks to stifle Green's inherent skills.

The Court acknowledges that the covenant does not bar Green's sole means of support. Green and GFS could continue in the mobile field and maintain some form of income. However, the detriment to Green is disproportionate to the benefit to Altronic. Green would be foreclosed from utilizing technology he claims to have developed, and Altronic would effectively foreclose significant competition in stationary market. Moreover, Altronic is simultaneously seeking monetary damages from GFS for any ultimate sales of the EVO-SP, so any additional damage flowing from Green's employment would be minimal.

Finally, it is undisputed that Green's talents were not developed while working for Altronic. In fact, Green's employment with Altronic only began *after* Altronic purchased patents for products that Green had invented. Further, Green testified that he attempted to approach management at Altronic about the possibility of improving their products. It was only after Altronic declined to pursue this venture that Green sought to improve the products. Thus, it is clear that Green's talents existed prior to his employment and that Green offered his talents once again during his employment, only to have that offer declined.

Based upon the above, the Court cannot find that Altronic has shown by clear and convincing evidence a strong likelihood of success on the merits on its non-compete claim. Moreover, the Court's analysis above encompasses the harm to Green and the public interest, so it need not evaluate those issues any further.

Finally, the Court finds no irreparable harm flowing from Green's employment. As detailed above, he has no confidential information that would not be otherwise unknown to GFS. Moreover, if GFS has breached the licensing agreement, Altronic will be fully compensated through monetary damages. As Green's continued employment directly aligns with the allegations of the licensing agreement breach, the monetary damages will similarly overlap. As such, the Court finds that no TRO should issue against Green.

### III. Conclusion

Altronic's motion for a temporary restraining order is DENIED.

IT IS SO ORDERED.


Date: <u>December 10, 2012</u>             ____/s/ Judge John R. Adams_____
                                           JUDGE JOHN R. ADAMS
                                           UNITED STATES DISTRICT COURT